818 A.2d 259

**STATE OF MARYLAND COMMISSION
ON HUMAN RELATIONS**

v.

**KAYDON RING & SEAL, INC.**

**No. 118, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

March 3, 2003.

**668**

Patricia A. Wood, Assistant General Counsel (Glendora C. Hughes, General Counsel, on the brief), Baltimore, for appellant.

Barnett Q. Brooks (Barnett Q. Brooks & Assoc., LLC, on the brief), Baltimore, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER, and GREENE, JJ.

DEBORAH S. EYLER, Judge.

The Maryland Commission on Human Relations ("Commission"), the appellant, challenges a judgment of the Circuit Court for Baltimore City reversing the Commission's decision that Kaydon Ring & Seal, Inc. ("Kaydon"), the appellee, terminated Andre Henry from employment because of his race, thereby committing an unlawful employment practice. The Commission presents two issues on appeal, which we have rephrased:

I.  Did the circuit court err in failing to apply the correct standard of review and in exceeding its authority?

II. Was there substantial evidence in the record to support the Commission's decision?

For the following reasons, we shall reverse the judgment of the circuit court, vacate the Commission's decision, and remand the case to the Commission for further proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

On September 2, 1994, Andre Henry filed with the Commission an employment discrimination complaint against Kaydon. Henry, who is black and was born in Jamaica, alleged that Kaydon had discriminated against him by terminating his employment on the basis of his race and national origin.

The Commission investigated Henry's complaint and on November 16, 1995 issued a finding of probable cause. On May 21, 1996, after conciliation efforts failed, the Commission filed a statement of charges against Kaydon with the Office of Administrative Hearings.

### *The First ALJ Decision*

On January 7 and 8, 1997, an Administrative Law Judge ("ALJ") held an evidentiary hearing on the charges. The Commission called as witnesses Henry; a Commission supervisor; and six present or former employees of Kaydon. Kaydon called two of its employees. Numerous documents were admitted into evidence.

On August 28, 1997, the ALJ issued a written decision making factual findings, listed numerically, including the following. Kaydon is a Baltimore company that manufactures seals and gaskets. On June 1, 1994, it hired Henry to work as a machine shop operator in Intermediate Shop B, section 708 of its plant. Henry had some previous machine operating experience and held an associate's degree in aviation maintenance technology and a master of mechanics certificate from Eastern Airlines.

Upon being hired, Henry was placed on probation, as are all new employees at Kaydon. Kaydon's rules require that new employees serve a probationary period of between 60 and 120 days.

Larry Fiddler, a white male, worked as the "lead man" in Intermediate Shop B. Fiddler's duties included telling the machine operators which machines to run. Steve Skinner, also a white male, was the foreman in two sections of Interme-

diate Shop B, including section 708. When Henry was hired, Skinner had held the foreman's position for nine years.

As foreman, Skinner was Henry's immediate supervisor and was solely responsible for evaluating his performance. The criteria Skinner used to evaluate employees were safety, quality of work, productivity, and attitude. Skinner assessed employees based on what he was told about their performance and what he observed first hand. Sixty percent of the people Skinner supervised and evaluated were black. Skinner had full authority and discretion to fire the probationary employees he was charged with supervising.

New employees at Kaydon received little formal training. Instead, they were immediately put to work manufacturing products, and were assigned to various machine operators who showed them the proper methods for operating the machines. Thus, new employees received "on the job" training. During his period of probation, Henry operated the cam-turn machine, the outside diameter machine, the inside diameter machine, and the auto vent machine. Several of the employees who testified at the hearing trained him to operate those machines.

Kaydon imposed production goals and efficiency requirements on all employees, including probationary employees. Kaydon officials talked to the machine operators about the productivity requirements they were supposed to meet.

Skinner expected the employees he supervised to perform their jobs well. He had a short temper, and would become upset with employees who were not performing up to his expectations.

Henry had problems with his job performance, including low productivity and gross efficiency ratings, sitting down on the job, leaving his assigned work area without permission, and leaving early for breaks and lunch. Henry's productivity ratings and gross efficiency ratings were significantly lower than those of other employees in the same department. Skinner discussed these performance problems with Henry. Skinner was not satisfied with the quality of Henry's work.

On August 12, 1994, Skinner extended Henry's probationary period for 60 days, for additional training. At the same time, Skinner and Arnold Ford, a Union Representative, met with Henry and told him his performance was unsatisfactory.

When Kaydon hired Henry, it also hired two other machine operators: Steve Butz and Tom Morgan. Both men are white and American born. Like Henry, Butz and Morgan were put on probation and received "on the job" training.

Butz had previous experience as a machine operator. He performed satisfactorily during his probationary period at Kaydon. After 60 days, Skinner decided, based on Butz's performance, that Butz had successfully completed his probation. Butz completed his probation by outperforming Henry and Morgan.

Unlike Butz, Morgan was not an efficient employee and did not perform satisfactorily, in Skinner's view. For that reason, Morgan did not successfully complete his probationary period.

Morgan's father also was employed by Kaydon. At Kaydon, it was not unusual for an employee to be given special treatment because one of his parents was a Kaydon employee. This preferential treatment, a form of nepotism, was extended to Kaydon employees of all races and national origins.

During his probationary period as a machine operator, Morgan applied for a trucker's job at Kaydon. The job, which paid less than the machine operator's job, was advertised plant-wide. Morgan was the only person who made a bid for the trucker's job. He did not apply for any other jobs at Kaydon. Morgan was qualified for the trucker's job, and was offered the job for that reason. Morgan accepted the offer.

Henry did not apply for the trucker's job or any other job at Kaydon.

Ten days after Henry's probation was extended, Skinner fired him. Skinner did so "because he was angry that a lot of production was lost as a result of [Henry's] not operating all the machines Skinner had assigned him to operate that day."

After Henry was discharged, Kaydon offered the next machine operator's job to a black man. That person did not appear for his physical examination, however, and therefore was not hired.

Black and white employees and employees of various national origins were hired by Kaydon to work in the departments supervised by Skinner. Skinner fired employees who were black, white, and of various national origins. From September 1992 to September 1994, in addition to Henry, four employees were discharged in section 708: a white American female fired for attendance problems; a white American male fired for missing time; a white Russian born male who was terminated for inability to perform; and a black American male who was terminated for inability to perform. Both white and black employees successfully completed probation while being supervised by Skinner.

Skinner did not consider race or ethnicity when he trained or terminated employees. No one ever told him that Henry felt harassed or discriminated against based on race or national origin.

After making those findings, the ALJ proceeded to address the Commission's charges, under Md.Code (1994), article 49B, section 16(a), that Kaydon had terminated Henry's employment because of his race or national origin. The ALJ decided the charges by applying the analytical framework for evaluating claims of employment discrimination under Title VII of the Civil Rights Act of 1964, as articulated by the United States Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Under the *McDonnell Douglas* framework, applicable when the complainant does not have direct proof of an intent to discriminate, the complainant first must establish a *prima facie* case of discrimination. *Prima facie* proof gives rise to a rebuttable presumption of discrimination, which shifts the burden of production to the employer to state a legitimate, non-discriminatory reason for the action complained about. When the employer does so, the complainant then must prove,

by a preponderance of the evidence, that the employer's stated reason for the termination was a pretext. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Killian v. Kinzer,* 123 Md.App. 60, 68, 716 A.2d 1071 (1998); *Brandon* v. *Molesworth,* 104 Md.App. 167, 188, 655 A.2d 1292 (1995), *aff'd in part, rev'd in part,* 341 Md. 621, 672 A.2d 608 (1996).

The ALJ decided that the Commission had established a *prima facie* case of intentional discrimination and that Kaydon then met its burden of production by stating a legitimate, non-discriminatory reason for terminating Henry: namely, that Henry's job performance, including his performance on the day he was fired, was unsatisfactory, both independently and relatively, that is, in comparison to other employees in the same position. The ALJ concluded that the Commission did not meet its burden of showing, by a preponderance of the evidence, that the reason articulated by Kaydon for firing Henry was a pretext. In particular, the ALJ found unpersuasive the testimony of Henry's co-employees that they were surprised about his termination because they thought he was performing up to par. The ALJ noted that the employees were not charged with evaluating Henry's performance and, unlike Skinner, were not in a position to do so.

The ALJ found that the evidence about Henry's productivity and efficiency ratings, especially when compared to such data for other employees, supported Skinner's assessment that Henry was not performing satisfactorily. The ALJ also rejected arguments by the Commission that Kaydon had treated Butz and Morgan preferentially to Henry, thus evidencing that the company's decision to terminate Henry was motivated by his race or national origin, and not by his poor performance. The ALJ found that Butz had graduated from probation because he had performed well and that Morgan had been hired in the trucker's job because he was qualified for it and was the son of another Kaydon employee.

The ALJ found no evidence at Kaydon of a pattern of hirings or terminations based on race or national origin over

the nine year period in which Skinner had acted as foreman, up to the time Henry was fired. The ALJ stated, "I find it clear, from the testimony and the documentary evidence produced at the hearing, that [Henry's] low productivity and unsatisfactory work performance led to his termination."

On these findings, the ALJ dismissed the discrimination complaint.

### The First Administrative Appeal— Unlawful Discrimination

The Commission appealed the ALJ's decision to the Appeal Board of the Commission ("Appeal Board"), which reviewed the matter on the record. On June 9, 1998, the three member Appeal Board issued a memorandum opinion and order vacating the ALJ's decision and remanding the case for further proceedings.

The Appeal Board found that all of the ALJ's enumerated findings of fact were supported by substantial evidence in the record and "affirmed ... and adopted" them. The Appeal Board stated, however, that the Commission's regulations governing decisions of an ALJ in an employment discrimination case require the ALJ's order to "include 'findings of fact and conclusions of law upon *each material issue* of fact and law presented in the record[,]'" (quoting Code of Maryland Regulations ("COMAR") 14.03.01.09H(1)) (emphasis in Appeal Board's opinion), and concluded that the ALJ's decision did not meet that standard because it omitted findings about evidence the Commission had presented about "racial animosity on the part of Steve Skinner."

In particular, the Appeal Board cited testimony by several current and former employees of Kaydon who had been supervised by Skinner that Skinner treated black employees more harshly than white employees by cursing and yelling at them, talking down to them, and reprimanding them for infractions that he would overlook when committed by whites; and testimony by Henry that Skinner had treated him with

disrespect, by not calling him by name, snapping his fingers and whistling at him, and shouting and yelling at him.

In addition, the Appeal Board pointed out evidence in the record that Skinner "may have singled out Henry to be terminated" on the day he was fired. According to Henry's testimony, he was operating two of the three machines he was assigned that day because Fiddler had told him to operate only two of them. When Skinner confronted him about operating only two machines, he told Skinner he was acting under Fiddler's orders. Skinner did not check with Fiddler to verify whether that was the case. Instead, Skinner became angry and fired him.

The Appeal Board concluded that because the ALJ's decision did not address these items of evidence, which the Appeal Board characterized as "material," the decision could not be reviewed and required a remand for the ALJ "to prepare legally adequate findings of fact and conclusions of law. . . ." The Appeal Board acknowledged that the ALJ's decision included a statement that he had considered and rejected all proposed findings of fact *not* included in his opinion but stated that "on the crucial factual issues presented by the Commission pertaining to racial animosity on the part of Skinner and disparate treatment of Henry based on his race, a general, catch-all ruling . . . does not satisfy the principles of review of ALJ decisions by the Appeal Board or the Commission's own regulations."

### The Second ALJ Decision—Unlawful Discrimination

On remand, the ALJ reviewed the evidence adduced at the January 1997 hearing and issued a second decision, dated December 2, 1998. The ALJ's enumerated findings of fact included all those in his first decision and the following:

• Skinner extended Henry's probation because he had to speak to him numerous times about his poor performance; and Skinner was not obligated to extend Henry's probation at all.

- On the morning of the day he was fired, Henry was assigned to work three machines. When Skinner walked by and saw that one of the machines was not running, he thought nothing of it. Later, at about 2:30 p.m., Skinner walked by and saw that one of the machines still was not running. He asked Henry why, and Henry replied that Fiddler had said not to run the machine. Skinner again told Henry to operate the machine. Skinner was angry, and walked away to try to cool off. Instead, he decided to terminate Henry's employment, because he believed that a lot of production had been lost as a result of Henry's not running all the machines he had been assigned. Skinner terminated Henry without checking with Fiddler to see if Fiddler in fact had told Henry not to operate one of the machines.

- In dealing with black employees on a daily basis, Skinner often treated them less favorably than white employees. "He had a tendency to yell and scream at some blacks in a way that he would not do with whites."

- Skinner did not consider race or ethnicity when he trained or terminated employees.

The ALJ proceeded to analyze the employment discrimination claim much as he had done in the first decision, under *McDonnell Douglas v. Green.* He concluded that the Commission had made out a *prima facie* case of employment discrimination, for the same reasons he originally so concluded; that Kaydon had articulated a legitimate, non-discriminatory business reason for terminating Henry's employment, to wit, his unsatisfactory job performance; and that the Commission had not met its burden of showing by a preponderance of the evidence that the reason articulated by Kaydon was pretextual.

With respect to the latter issue, the ALJ found:

Based upon its Remand Order, it appears [the Appeal Board] has inferred from the record that [Kaydon] has engaged in unlawful employment discrimination with regard to [Henry]. It is reasonable to infer that because Skinner

generally treats blacks in the work place with less dignity than he does whites, he is biased toward blacks. One could also infer that from the evidence that because Skinner treated blacks less favorably than whites he would be more likely to fire a black employee due solely to the employee's race. Such inferences, however, must be tempered by the other evidence of record. Mere rhetoric is not evidence. In the instant case, the Commission did not support its allegations with credible evidence.

Whether [Henry] was terminated for poor performance or due to the color of his skin raises a genuine issue of fact. The Commission seems to believe that because Skinner treated blacks with less respect than he did whites, it has proven that Skinner engaged in unlawful employment discrimination by terminating [Henry] for a discriminatory purpose. As noted above, that is one possible inference. However, I do not believe that a fair view of the totality of the evidence supports such an inference. While there was some general testimony that blacks were sometimes kept on probation longer than whites, other evidence of specific acts of unlawful employment discrimination was not present. No creditable [sic] evidence was presented that black employees were disciplined, not promoted or otherwise subjected to unlawful employment discrimination by [Kaydon]. None of those to whom these alleged practices occurred verified the testimony in that regard. In fact, Mr. Watkins testimony was less than convincing . . . .

\* \* \* \*

[Henry] testified that on the day of his firing Skinner told him to leave the work floor and that he was being fired because he could not "cut it." That testimony is, I believe, consistent with Skinner's testimony that he fired [Henry] after a specific incident following a history of performance problems. Skinner was angry that, in his view, [Henry] was not following instructions and his failure to do so caused production deficiencies. It is also unrefuted that Skinner was under no obligation to extend [Henry's] probation. A

better supervisor might have attempted to verify [Henry's] reason for not running all of the machines, but Skinner did not. This does, in fact, support the other evidence that Skinner was the kind of person who angers quickly and does not always react in a calm rational manner. However, it does not show that his reason for terminating [Henry] was pretextual.

The ALJ issued a second order dismissing the complaint.

### The Second Administrative Appeal—
### Unlawful Discrimination

The Commission again appealed to the Appeal Board. On September 15, 1999, the Appeal Board, by a two-to-one vote, issued a decision and order reversing the ALJ's decision that Kaydon did not engage in unlawful employment discrimination on the basis of race; affirming the ALJ's decision that Kaydon did not engage in unlawful employment discrimination on the basis of national origin; and remanding the case for further proceedings to determine the appropriate relief to which Henry might by entitled.

The Appeal Board's decision was made from a review of the record, after oral argument of counsel. The Appeal Board determined that all the findings of fact made by the ALJ, as set forth in the "Findings of Fact" section of his opinion (including the ALJ's original factual findings), were supported by substantial evidence in the record, and therefore were "affirmed." It noted, however, that it did not consider "conclusive" the ALJ's factual findings that Skinner fired Henry because he was angry and believed a lot of production had been lost and that Skinner did not take race or ethnicity into consideration when he trained or terminated employees, even though there was evidence in the record to support those findings.

After describing the "ultimate issue" in the case as "whether the evidence in the record as a whole supports a finding that Kaydon ... unlawfully discriminated against Andre Henry on the basis of his race and/or national origin[,]" the Appeal

Board found, "having considered the entire record, . . . that the Commission in this case did sustain its burden of proof with respect to unlawful discrimination on the basis of race. . . ."

We shall discuss the Appeal Board's second decision in depth in our discussion of the issues.

### The Third ALJ Decision—Remedy

On second remand, the ALJ held an evidentiary hearing at which Henry testified for the Commission and Kaydon called its director of human resources. The ALJ incorporated by reference his prior findings and made additional findings, including extensive findings relevant to the issue of economic loss.

The ALJ found the Commission had "presented virtually no evidence to establish that [Henry] would have been retained by [Kaydon] in another capacity or what economic loss [Henry] may have incurred, if any, as a result of benefits he did not received [sic] by virtue of his termination by Kaydon." On that basis, the ALJ concluded that the Commission had not met its burden of proving actual economic loss resulting from discrimination. The ALJ further found that even if he assumed that, absent unlawful discrimination, Henry would have stayed at Kaydon and been hired in a trucker's job, as Morgan had been, the evidence showed that Henry would not have earned as much money as he actually earned from employment he obtained elsewhere after Kaydon discharged him. The ALJ concluded that Henry was not entitled to back pay or to the remedy of reinstatement.

### The Third Administrative Appeal—Remedy

The Commission filed a third appeal with the Appeal Board. The Appeal Board concluded that Henry was entitled to $20,328.60 in back pay but was not entitled to reinstatement. The Appeal Board's back pay award equaled the difference between the sum Henry would have earned had he continued work in the machine operator's job at Kaydon for 36 months after his termination date and the sum he actually earned at

other employment during that period. The Appeal Board issued an order directing Kaydon to pay that sum to Henry.

On February 7, 2001, the Commission adopted the Appeal Board's decision as its final agency action.

### The Action for Judicial Review

On March 6, 2001, Kaydon filed in the Circuit Court for Baltimore City an action for judicial review and a motion to stay enforcement of the administrative order. The motion to stay was granted after the Commission consented to it and Kaydon posted a bond. In the meantime, a petition the Commission filed in the same court for enforcement of the administrative order was consolidated with the action for judicial review.

The parties filed memoranda and on November 27, 2001, the court held a hearing at which it entertained argument of counsel. On February 28, 2002, the court issued a memorandum decision and order reversing the decision of the Board and the Commission and ordering that judgment be entered in favor of Kaydon.

## DISCUSSION

### (i)

The Commission is a state agency established by section 1 of article 49B of the Maryland Code and having as one of its duties the adjudication of claims of unlawful discrimination. Art. 49B, § 3(c).

Section 16 of article 49B prohibits discriminatory employment practices, including discharging a person from employment because of his race or national origin. A person claiming employment discrimination may file a complaint with the Commission, see art. 49B, section 9(a), which will conduct an investigation. Art. 49B, § 10(a). If the investigation reveals "probable cause for believing a discriminatory act has been or is being committed within the scope" of article 49B, the Commission's staff must undertake to eliminate the discrimi-

nation by agreement, *see* section 10(b) and, if no agreement is reached, enter a finding to that effect and issue a written complaint to the respondent. The case then is set in for a hearing before a hearing examiner. § 11(a). Under section 2, the Commission is authorized to appoint hearing examiners, who shall be attorneys, and the hearing examiners "shall conduct hearings, make findings of fact, and draw conclusions of law in discrimination cases assigned" to them. Section 2(b). Pursuant to COMAR 14.03.01.09A, the Commission has delegated to ALJs with the Office of Administrative Hearings the role of acting as hearing examiners. As hearing examiners, the ALJs have the powers and duties given them in accordance with COMAR 28.02.01.08A and B.

The hearing is an evidentiary proceeding at which the respondent "may submit testimony and shall be fully heard" and may examine and cross-examine witnesses. § 11(b). At its conclusion, the hearing examiner must prepare a provisional order, section 2(b), which must include "findings of fact and conclusions of law upon each material issue of fact and law presented on the record." COMAR 14.03.01.09H(1). In the absence of a timely appeal, the hearing examiner's decision and order become the final decision and order of the Commission. § 2(b); COMAR 14.03.01.09H(5).

"If upon all the evidence, the hearing examiner finds that the respondent has engaged in any discriminatory act within the scope of [Article 49B], the hearing examiner shall so state in the findings" and shall issue a cease and desist order. § 11(e). When the discriminatory act in question is an unlawful employment practice, the hearing examiner may include as a remedy reinstatement or hiring of the former employee with or without back pay, or other appropriate equitable relief. § 11(e); COMAR 14.03.01.09H(2). "If upon all the evidence" the hearing examiner finds "the respondent has not engaged in any alleged discriminatory act within the scope of [Article 49B]," the hearing examiner "shall state [his or her] findings of fact and shall similarly issue and file an order dismissing the complaint." § 11(g). *See also* COMAR 14.03.01.09H(3).

In addition to their other duties, the commissioners serve as the "Appeal Board" for administrative review of decisions of the hearing examiners. § 3(d). The Appeal Board is comprised of three commissioners. COMAR 14.03.01.10D.

"[A]s determined by the rules of procedure of the Commission, [the Appeal Board] may allow any party affected by the [hearing] examiner's decision to introduce additional relevant testimony or evidence at the time of an appeal from the [decision of the] hearing examiner." § 3(d). *See also* COMAR 14.03.01.10E(5). Thus, the Appeal Board may accept new evidence but is not authorized to conduct a *de novo* evidentiary hearing. Section 11(g) applies to the Appeal Board as it does to the hearing examiners. Thus, "[i]f upon all the evidence, . . . the Commission finds that the respondent has not engaged in any alleged discriminatory act within the scope of the particular subtitle, it shall state its findings of fact and shall similarly issue and file an order dismissing the complaint." Section 11(g).

COMAR 14.03.01.10, entitled "Review by the Appeal Board of Decisions of the Administrative Law Judge," provides, in pertinent part, that the person appealing the decision of the ALJ "shall set forth in writing a concise statement of issues upon which th[e] appeal is taken," together with a memorandum of law in support. COMAR 14.03.01.10B. The "appellee or appellees" then shall file an answer and supporting memorandum. COMAR 14.03.01.10C. The Appeal Board may permit oral argument or decide the appeal without oral argument, COMAR 14.03.01.10E(1) and (2), and "may permit the admission of additional evidence not produced at a public hearing, upon a request made and good cause shown by the party proposing admission of the new evidence." COMAR 14.03.01.10E(5). The Appeal Board "may affirm, reverse, or modify" the hearing examiner's decision. COMAR 14.03.01.10F(1). In making its determination, the Appeal Board "shall consider: (a) [t]he entire record; or (b)[u]pon agreement of the parties, . . . the statement of the case, including the decision of the [hearing examiner]." *Id.*

The "entire record" standard of administrative review was adopted by the Commission effective October 9, 1998, shortly before the second administrative appeal in this case. *Maryland Register*, Vol. 25, Issue 21, at 1575. Before then, the regulation provided that the Appeal Board could "affirm, reverse, or modify" the hearing examiner's decision "in accordance with the standards as set forth in State Government Article, § 10–222(h), Annotated Code of Maryland." *See Maryland Register*, Vol. 25, Issue 4, at 269 (setting forth proposed action on COMAR 14.03.01.10F(1). That section sets forth (and set forth then) the "substantial evidence" standard that governs judicial review of factually based decisions of administrative agencies, under the Maryland Administrative Procedure Act. Thus, prior to October 9, 1998, the Appeal Board reviewed decisions of hearing examiners using the same "substantial evidence" standard governing judicial review of agency decisions. Thereafter, and at the time relevant to this case, the Appeal Board has reviewed decisions of hearing examiners upon consideration of the "entire record."

### (ii)

In this case, the outcome of the Appeal Board's "entire record" administrative review (that is, the Appeal Board's second decision) was that it found, contrary to the ALJ's determination, that Kaydon had intentionally discriminated against Henry by terminating him from employment because of his race.

In the second administrative appeal, the Commission posed three questions to the Appeal Board: 1) "Whether the Appeal Board may vacate the [ALJ's] decision ... and issue a decision of its own finding that Kaydon discriminated against ... Henry in violation of Article 49B and order[] the relief sought by the Commission in its Statement of Charges?"; 2) "Whether the [ALJ] erred in his decision upon remand by the Appeal Board by failing to make a finding of fact as to each material issue of fact such as to require the Appeal Board to vacate the decision?" and 3) "Whether the ALJ erred in his decision upon remand by the Appeal Board by failing to make legally

adequate findings of fact and conclusions of law such as to require the Appeal Board to vacate the decision?"

With respect to the first issue, the Commission argued that the new "entire record" standard of review applicable to administrative appeals under article 49B gave the Appeal Board broad discretion to substitute its judgment for that of the ALJ, including discretion to resolve credibility issues not resolved by the ALJ or to resolve those issues differently than did the ALJ. The Appeal Board ruled that it did not have to address that issue because its decision was being made "based on its consideration of the entire record including the [ALJ's] assessment of the credibility of witnesses" and "differ[ed] from that of the [ALJ] because the [Appeal] Board believe[d] that the application of the law to the facts in the record, and the inferences to be drawn therefrom, require[d] a different result."

The Appeal Board rejected the Commission's second issue, ruling that the ALJ's second decision met the requirement of COMAR 14.03.01.09H(1), that the proposed order contain findings of fact and conclusions of law on each material issue of fact and law presented.

The Appeal Board then turned to the third and final issue, stating: "The ultimate issue for the Appeal Board to resolve in this case is whether the evidence in the record as a whole supports a finding that [Kaydon] unlawfully discriminated against ... Henry on the basis of his race and/or national origin." The Appeal Board acknowledged the record contained evidence tending to support Kaydon's claim that Henry was discharged for legitimate, non-discriminatory reasons, namely his record of poor performance. It found, however, that, notwithstanding that evidence, "the preponderance of the evidence support[ed] the Commission's argument that Henry was terminated intentionally due to the fact that he is black."

The Appeal Board identified two primary factors supporting its conclusion: "(1) the evidence of Steve Skinner's racially motivated treatment of black workers on the job, and (2) the differential treatment afforded a white employee, Tom Mor-

gan, who was similarly situated to Henry." With respect to the first factor, after quoting the ALJ's observation that it would be possible to infer from Skinner's poor treatment of blacks in the workplace that he might fire a worker for being black (without then quoting the next portion of the ALJ's opinion, in which he found that the evidence considered as a whole did not support a finding that Skinner had terminated Henry on account of his race), the Appeal Board commented: "Skinner's pattern of treating black workers less favorably than white workers on the job suggests that any decision by Skinner to terminate the employment of a black employee should be subjected to close scrutiny."

With respect to the second factor, the Appeal Board reviewed the evidence about Morgan's having bid for, and received, the trucker's job at Kaydon. Citing the testimony of employee Ralph Lane, the Appeal Board stated that there was evidence in the record that Skinner had responded to Morgan's performance problems by suggesting he apply for the trucker's job but had responded to Henry's inquiries about transferring to the trucker's job by saying it would be against the union contract for a probationary employee to transfer to another job at Kaydon. At the evidentiary hearing, Skinner had denied telling Henry that. The Appeal Board acknowledged Skinner's testimony but found he had treated Henry differently than Morgan by not standing in Morgan's way when Morgan applied for the trucker's job but firing Henry abruptly "without investigating whether a firing was justified or not" that is, whether Fiddler had told him not to run one of the machines on the day of the firing.

The Board finished its opinion by stating:

The [Board] concludes that Skinner's different treatment on the job of black employees and white employees who worked under his supervision, the company's award of a trucker's job to Morgan, a white employee similarly situated to Henry, and Skinner's different response to and treatment of Morgan and Henry, both of whom were not, in Skinner's view, performing satisfactorily, constitute proof by a pre-

ponderance of the evidence that Henry was unlawfully terminated by Kaydon because of his race.

(Footnote omitted.)

The Appeal Board reversed the ALJ's second decision dismissing the complaint, and remanded the matter for a decision on the appropriate remedy. Once the remedy was decided (by the Appeal Board, upon review of the ALJ's decision, and reversing it), the Commission adopted the Appeal Board's decision as the final agency action, *see* COMAR 14.03.01.10H(5), and the final agency action became subject to judicial review in the circuit court under section 10–222 of the State Government Article ("SG").

### (iii)

Under SG section 10–222(h)(3), in a circuit court action for judicial review, the court may reverse or modify the agency's final decision "if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision" was unconstitutional; "exceed[ed] the statutory authority or jurisdiction of the agency"; "result[ed] from an unlawful procedure"; was "affected by any other error of law"; was "unsupported by competent, material, and substantial evidence in light of the entire record as submitted"; or was "arbitrary or capricious."

In *Stover v. Prince George's County,* 132 Md.App. 373, 752 A.2d 686 (2000), we explained that on appeal from the decision of a circuit court in an action for judicial review of the final decision of an administrative agency, this Court performs the same function as did the circuit court:

> When reviewing a decision of an administrative agency, this Court's role is "precisely the same as that of the circuit court." *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994) (citation omitted). "Judicial review of administrative agency action is narrow. The court's task on review is not to 'substitute its judgment for the expertise of those persons who constitute the administrative agency.'" *United Parcel*

*Service, Inc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–577, 650 A.2d 226 (1994) (quoting *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978)). Rather, "to the extent the issue on appeal turns on the correctness of an agency's findings of fact, such findings must be reviewed under the substantial evidence test." *Department of Health and Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citation omitted). The reviewing court's task is to determine "whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions." *Maryland Commission on Human Relations v. Mayor and City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). The court cannot substitute its judgment for that of the agency, but instead must exercise a "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions." *State Administrative Board of Election Laws v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819 (1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1644, 104 L.Ed.2d 159 (1989) (quoting *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.,* 313 Md. 614, 625, 547 A.2d 190 (1988)).

(Citation omitted; emphasis removed.)

The reviewing court's analysis has three parts:

1.  First, the reviewing court must determine whether the agency recognized and applied the correct principles of law governing the case. The reviewing court is not constrained to affirm the agency where its order "is premised solely upon an erroneous conclusion of law."

2.  Once it is determined that the agency did not err in its determination or interpretation of the applicable law, the reviewing court next examines the agency's factual findings to determine if they are supported by substantial evidence, i.e., by such relevant evidence as a reasonable mind might accept as adequate to support a conclu-

sion. At this juncture, . . . "it is the agency's province to resolve conflicting evidence, and, where inconsistent inferences can be drawn from the same evidence, it is for the agency to draw the inference."

3. Finally, the reviewing court must examine how the agency applied the law to the facts. This, of course, is a judgmental process involving a mixed question of law and fact, and great deference must be accorded to the agency. The test of appellate review of this function is "whether, . . . a reasoning mind could reasonably have reached the conclusion reached by the [agency], consistent with a proper application of the [controlling legal principles]."

*Comptroller of the Treasury v. World Book Childcraft Int'l, Inc.,* 67 Md.App. 424, 438–439, 508 A.2d 148, *cert. denied,* 307 Md. 260, 513 A.2d 314 (1986)(quoting *Ramsay, Scarlett & Co., Inc. v. Comptroller of the Treasury,* 302 Md. 825, 834–838, 490 A.2d 1296 (1985)).

*Id.* at 380–82, 752 A.2d 686.

In *Dep't of Health & Mental Hygiene v. Shrieves, supra,* 100 Md.App. 283, 641 A.2d 899, this Court, through Judge Diana G. Motz, described the process we undertake upon review of a final agency decision made in an "on the record" administrative appeal and overruling an ALJ's decision. Despite that procedural posture, it remains the agency's final decision, not the ALJ's decision, that we review for substantial evidence. Thus, "the question . . . is not 'whether the agency erred' in overruling the ALJ but whether there is substantial evidence for the agency's decision." 100 Md.App. at 302, 641 A.2d 899. More precisely, this Court's " 'job' [is] not to assess the 'rationality' of or evidentiary basis for the ALJ's recommendation; it [is] to assess the rationality or evidentiary basis of the agency's . . . final order." *Id.* at 297, 641 A.2d 899 (citing *Parker v. Sullivan,* 891 F.2d 185, 189 (7th Cir.1989), and *Drexel Burnham Lambert, Inc. v. Commodity Futures Trading Comm'n,* 850 F.2d 742, 747 (D.C.Cir.1988)).

In assessing the rationality and evidentiary basis for the agency's final decision, however, we may take into account as a factor that on a cold record the agency made a decision contrary to the one the ALJ made on a live record, *i.e.,* upon first-hand observation of witnesses:

[A reviewing]   court should recognize

that evidence supporting [the agency's] conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the [agency's] than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony.

100 Md.App. at 297, 641 A.2d 899 (quoting *Anderson v. Dep't of Pub. Safety & Corr. Servs.,* 330 Md. 187, 216, 623 A.2d 198 (1993), in turn quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

We must be mindful, however, that the agency's power to reverse the decision of an ALJ is not limited to those situations in which the ALJ's factual findings are clearly erroneous. The agency itself makes factual findings, taking into consideration the factual findings made by the ALJ. When the ALJ's factual findings are the product of assessing the credibility of the witnesses, " 'the agency should give appropriate deference to the opportunity of the [ALJ] to observe the demeanor of the witnesses,' and the agency should reject credibility assessments only if it gives 'strong reasons.' "  100 Md.App. at 298, 641 A.2d 899 (quoting *Anderson,* 330 Md. at 213, 623 A.2d 198). In other words, while the agency ordinarily must not defer to the ALJ's findings, it should give substantial deference to the ALJ's credibility determinations to the extent they are critical to the outcome of the case *and* they are demeanor-based, that is, they are the product of observing the behavior of the witnesses and not of drawing inferences from and weighing non-testimonial evidence. *Berkshire Life Ins. v. Md. Ins. Admin.,* 142 Md.App. 628, 648, 791 A.2d 942 (2002);

*Gabaldoni v. Bd. of Physician Quality Assurance*, 141 Md. App. 259, 261–62, 785 A.2d 771 (2001).

> Judge Motz summarized the holding in *Shrieves* as follows: [W]hen an administrative agency overrules the recommendation of an ALJ, a reviewing court's task is to determine if the agency's final order is based on substantial evidence in the record. In making this judgment, the ALJ's findings are, of course, part of the record and are to be considered along with the other portions of the record. Moreover, where credibility is pivotal to the agency's final order, [the] ALJ's findings based on the demeanor of witnesses are entitled to substantial deference and can be rejected by the agency only if it gives strong reasons for doing so. If, however, after giving appropriate deference to the ALJ's demeanor-based findings there is sufficient evidence in the record to support both the decision of the ALJ and that of the agency, the agency's final order is to be affirmed—even if a court might have reached the opposite conclusion. This approach preserves the rightful roles of the ALJ, the agency, and the reviewing court: it gives special deference to both the ALJ's demeanor-based credibility determinations and to the agency's authority in making other factual findings and properly limits the role of the reviewing court.

100 Md.App. at 302–03, 641 A.2d 899.

### (iv)

In its first question presented, the Commission contends the circuit court erred by applying an incorrect standard of review. We need not address this issue. As we have explained, on appellate review of an action for judicial review of a final agency decision, we perform precisely the same task as the circuit court. Thus, regardless of whether the circuit court applied a correct or incorrect standard of review, it only is necessary that in performing our review, we apply the correct standard. Accordingly, the sole issue for resolution in this appeal is the Commission's second question presented: Whether there was substantial evidence in the record to support the final agency decision?

The Commission contends the final agency decision must be affirmed because it is supported by substantial evidence in the entire record and is not arbitrary or capricious or otherwise subject to reversal for any of the reasons set forth in SG section 10–222(h).

Kaydon contends the final agency decision cannot be affirmed, for several reasons. First, the evidence in the record cannot support a *prima facie* finding of discrimination, under the *McDonnell Douglas* test as applied to discriminatory discharge cases. Second, the Commission's finding of a pretextual firing is not supported by substantial evidence because there is not evidence from which a reasoning mind reasonably could find disparate treatment and because the Commission, through the Appeal Board, did not give adequate deference to the ALJ's credibility determinations and itself made credibility determinations that necessarily were demeanor-based. Finally, with respect to the issue of remedy, Kaydon maintains there is not substantial evidence in the record to support the agency's finding of economic loss.

In its reply brief, the Commission argues, *inter alia,* that Kaydon waived its argument respecting proof of a *prima facie* case of unlawful discrimination.

### *Prima Facie Case*

Although the *McDonnell Douglas* case concerned an unlawful refusal to hire, the framework of proof adopted in that case has since been applied to other employment discrimination claims, including those alleging discriminatory terminations. *Douglas v. PHH FleetAmerica, Corp.*, 832 F.Supp. 1002, 1009 (D.Md.1993); *Nerenberg v. RICA,* 131 Md.App. 646, 661, 750 A.2d 655 (2000); *Brandon, supra,* 104 Md.App. 167, 188 n. 18, 655 A.2d 1292. The parties agree that the *McDonnell Douglas* framework applied to this case and required the Commission first to present *prima facie* proof that Kaydon terminated Henry from employment because of his race; and then, after Kaydon produced evidence of a non-discriminatory reason for the termination, to show that that reason was a pretext for Henry's termination, with Kaydon's actual reason for firing

Henry being his race. *Burdine, supra,* at 255, 101 S.Ct. 1089; *Killian, supra,* at 68, 716 A.2d 1071; *Brandon, supra,* at 188, 655 A.2d 1292.

In the termination context, a *prima facie* case is made out upon proof that the employee is a member of a protected minority; was discharged from employment; was qualified for the job in which he was working; and was discharged under circumstances raising a reasonable inference of intentional discrimination. *See Sengupta v. Morrison–Knudsen Co., Inc.,* 804 F.2d 1072, 1075 (9th Cir.1986); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984); *Marks v. Prattco, Inc.,* 607 F.2d 1153, 1155 (5th Cir.1979); *Scott v. Univ. of Del.,* 601 F.2d 76, 80 (3rd Cir.1979); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1013 (1st Cir.1979); *Price v. Maryland Cas. Co.,* 561 F.2d 609, 612 (5th Cir.1977); *Flowers v. Crouch–Walker Corp.,* 552 F.2d 1277, 1281 n.3 (7th Cir. 1977); *Garrett v. Mobil Oil Corp.,* 531 F.2d 892, 895 (8th Cir.1976), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976); *Potter v. Goodwill Indus.,* 518 F.2d 864, 865 (6th Cir.1975); *Levitz Furniture Corp. v. Prince George's County,* 72 Md.App. 103, 112, 527 A.2d 813 (1987) (quoting *Furnco Constr. Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)) (holding that in a case alleging intentional employment discrimination by means of termination of employment, a *prima facie* case is established "when a member of a protected group is discharged under circumstances which, if unexplained, would support an inference that the decision to discharge was 'based on the consideration of impermissible factors.' ").

In the evidentiary hearing on unlawful discrimination, in 1997, Kaydon did not argue that the Commission failed to make out a *prima facie* case. Rather, at the conclusion of the Commission's evidence, Kaydon went forward and produced evidence to show that it had terminated Henry's employment due to poor performance, not due to race or national origin. In his first decision, the ALJ addressed whether the Commission had established a *prima facie* case of unlawful discrimina-

tion and found that it had done so. Later, upon remand, but on the same record, the ALJ reached the same conclusion on the issue of *prima facie* case. As explained above, however, the ALJ's ultimate decision (both in his 1997 decision and his 1998 decision) favored Kaydon, in that he found that Henry in fact had performed poorly and that Kaydon in fact had terminated Henry for that reason and not because of his race or national origin.

In *United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court explained that in a Title VII discriminatory employment practice case tried under the *McDonnell Douglas* framework of proof, when, after the complainant has introduced evidence intended to establish a *prima facie* case, the employer responds by introducing evidence of a legitimate reason for the conduct at issue, *e.g.,* termination from employment, the question of whether a *prima facie* case was established is no longer viable. In the context of a failure to promote case, the Court explained:

> [W]hen the [employer] fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the [employee's] proof by offering evidence of the reason for the [employee's] rejection [for promotion], the factfinder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the *McDonnell* ... presumption [of discrimination] "drops from the case," [*Texas Department of Community Affairs v. Burdine,* 450 U.S. 248], 255 at n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 [(1981)] and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255, 101 S.Ct. 1089....

> The "factual inquiry" in a Title VII case is "[whether] the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* at 253, 101 S.Ct. 1089. In other words, is the employer ... treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.' *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), quoting *Teamsters*

*v. United States,* 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The prima facie case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra,* at 577, 98 S.Ct. 2943. *Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The [factfinder]* has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff." *Burdine, supra,* at 253, 101 S.Ct. 1089.

460 U.S. at 714–15, 103 S.Ct. 1478 (footnote omitted) (emphasis added).

■■■ In the case at bar, at the evidentiary hearing, Kaydon responded to the Commission's proof by producing evidence of what it contended was the true, non-discriminatory reason for its having terminated Henry—that Henry was not performing satisfactorily. Its evidence of poor performance on Henry's part was thus directed to the question of whether Henry's termination was for a prohibited, discriminatory reason (his race) or a legitimate reason (because he was performing poorly). Indeed, Kaydon did not argue that the Commission did not present a *prima facie* case. Under the reasoning of the Supreme Court in *Aikens,* which was followed by this Court in *Maryland Shipbuilding & Drydock Co., Inc. v. Md. Comm'n on Human Relations,* 70 Md.App. 538, 546–47, 521 A.2d 1263 (1987), whether the Commission made out a *prima facie* case became irrelevant once Kaydon went forward with its evidence, and therefore is not an issue properly before us on appeal.

Kaydon argues that recently, in *Nerenberg v. RICA,* 131 Md.App. 646, 750 A.2d 655 (2000), this Court in some manner rejected the reasoning of the United States Supreme Court in *Aikens* and our prior holding in *Maryland Shipbuilding &*

*Drydock Co., Inc.* and held in the context of an employment discrimination/discharge case that whether the complainant in such a case presented *prima facie* proof remains relevant on appeal, even after the ultimate issue of whether the discharge from employment was a product of intentional discrimination has been addressed.

Kaydon misreads *Nerenberg.* In that case, an employee's estate sued her former employer in circuit court, alleging that she had been discharged in violation of the two federal anti-discrimination statutes: the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* The appeal followed the grant of summary judgment in favor of the former employer.

Because of the posture of the case, this Court evaluated whether the evidence taken in the light most favorable to the estate/employee generated a genuine dispute of material fact either on the elements of a *prima facie* case or on the issue of pretextual firing, and concluded that it did not. Had the case gone to trial, and the former employer presented evidence of a non-discriminatory reason for the termination, then under *Aikens* and *Maryland Shipbuilding & Drydock* whether a *prima facie* case had been made out would not have been relevant on appeal. The issue was relevant on appeal because, given the posture of the case, the absence of a genuine dispute of material fact on the elements of a *prima facie* case supported the circuit court's decision to grant summary judgment.

Not only is Kaydon precluded from challenging at this stage of the proceedings the existence *vel non* of *prima facie* proof of discrimination under *Aikens* and *Maryland Shipbuilding & Drydock*, it also failed to preserve the issue for review in any event by not raising it before the ALJ at all and not raising it before the Appeal Board until after the issue of unlawful discrimination was decided by the Appeal Board. In the administrative phase of this case, the first and only time Kaydon raised the sufficiency of the proof of a *prima facie* case was in a motion for reconsideration on the issue of remedy. The Appeal Board denied the motion without com-

ment. By not arguing before the ALJ that the Commission did not make out a *prima facie* case and by not challenging before the Appeal Board the ALJ's decision that the Commission in fact made out a *prima facie* case, Kaydon failed to preserve the issue for judicial review. *Cicala v. Disability Review Bd.*, 288 Md. 254, 263, 418 A.2d 205 (1980) ("Because the issue ... was not raised during the administrative proceeding, it was not properly raised in the judicial review proceeding, and therefore is not properly before us."); *Severn v. Baltimore*, 230 Md. 160, 170, 186 A.2d 199 (1962).

Even if we were to consider Kaydon's *prima facie* case argument on its merits, however, we would reject it. Kaydon maintains that there was not substantial evidence in the record to support a finding in the Commission's favor on the third and fourth elements of a *prima facie* case of discrimination.

With respect to the third element—that the employee was meeting his employer's expectations at the time of discharge—Kaydon argues that the evidence overwhelmingly established that Henry was not qualified for the machine operator's job when he was discharged from employment. In his decision on that issue, the ALJ relied on evidence introduced by the Commission to conclude that the element was satisfied. Specifically, the Commission called several of Henry's co-workers who testified that he was able to handle the machines he was assigned to operate and was improving in his job. The ALJ observed: "The testimony of [Henry's] co-employees that in their view [Henry] was making progress and performing adequately is enough to demonstrate that [he] was qualified for the position at this [*prima facie*] stage of the *McDonnell Douglas* test."

We think the evidence the ALJ relied on was substantial enough to support his finding that Henry was qualified for employment when he was discharged, notwithstanding that the evidence further showed, and the ALJ further found, that Henry was not performing his job satisfactorily. In the *prima facie* case phase of the hearing, the primary evidence of

Henry's performance at the time he was fired came from co-employees who observed his work and from Henry, who, while acknowledging that his performance could improve, maintained he was not performing deficiently. Ultimately, in deciding the issue of qualification at the time of termination, the ALJ placed far greater weight on Skinner's testimony and statistics that showed that Henry was performing at a lower level than other employees. The fact that the ALJ made that ultimate finding does not mean, however, that the Commission's evidence was not adequate to show *prima facie* that Henry was performing up to Kaydon's expectations. Assuming, as we must, that the Appeal Board implicitly adopted the ALJ's decision on this point, we conclude there was substantial evidence in the record to support the Commission's decision that the third element of *prima facie* proof under the *McDonnell Douglas* standard was satisfied.

With respect to the fourth element, Kaydon argues there was no evidence presented by the Commission from which to draw a reasonable inference that race played a role in Henry's firing. We disagree.

In its second decision, the Appeal Board explained that one could draw a general inference from the evidence that Skinner routinely disparaged black employees but did not treat white employees that way, that he would be more likely to fire a black employee than a white employee; and for that reason, his decision to fire a black employee warranted close scrutiny. We read the Appeal Board's comment on this point as a finding on the fourth element of *prima facie* proof under the *McDonnell Douglas* framework. Viewing only the Commission's evidence, as introduced in the opening phase of the hearing, Henry was black, was discharged from employment, was not performing deficiently when he was fired, and was fired by Skinner, a white supervisor who routinely treated black employees disparagingly, in contrast to his treatment of white employees. In addition, the Commission presented proof, through Henry's testimony, that Skinner had treated Henry in that manner. Viewed in totality, this evidence was

enough to support a reasonable inference that Henry's termination was a product of intentional discrimination.

### Pretext and Ultimate Finding of
### Intentional Discrimination

Most of Kaydon's other contentions concern the Commission's conclusion that the reason it gave for discharging Henry—that he was not performing satisfactorily—was a pretext and that Henry really was fired because of his race. Kaydon challenges that conclusion as either being unsupported by substantial evidence or arbitrary and capricious. Applying the standard of review articulated in *Shrieves,* we conclude that a reasoning mind could not reach the decision the Commission reached in this case for the reasons it gave, *i.e.,* those stated by the Appeal Board.

When we review the decision of an administrative agency, our "appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence." *Ins. Comm'n v. Nat'l Bureau,* 248 Md. 292, 309, 236 A.2d 282 (1967). In other words, we may affirm the decision of an administrative agency only for the reasons relied upon by the agency. *County Council of Prince George's County v. Brandywine Enter., Inc.,* 350 Md. 339, 348, 711 A.2d 1346 (1998) (citing *Mossburg v. Montgomery County,* 329 Md. 494, 507, 620 A.2d 886 (1993), in turn citing *Harford County v. Preston,* 322 Md. 493, 503, 588 A.2d 772 (1991)).

Proof of an intent to discriminate based on race may be shown circumstantially by proof of disparate treatment by an employer of similarly situated employees of different races. *Nichols v. Harford County Bd. of Educ.,* 189 F.Supp.2d 325, 340 (D.Md.2002). *See generally, Callwood v. Dave & Busters, Inc.,* 98 F.Supp.2d 694, 706 (D.Md.2000). For instance, in the *McDonnell Douglas* case, in which the complainant alleged that the employer had refused to rehire him because he was black, and the employer claimed that it had rejected the complainant because he had engaged in unlawful protests

against it, the Court explained that "evidence that white employees involved in acts against the [employer] of comparable seriousness to [the complainant's acts] were nevertheless retained or rehired" would be relevant to the question of whether the stated reason for rejection given by the employer in fact was a pretext. 411 U.S. at 804, 93 S.Ct. 1817. *See also Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (explaining that "[d]isparate treatment" employment discrimination "is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.").

In the case at bar, the Appeal Board found that Henry and Morgan were similarly situated employees but were treated differently by Kaydon based on race. Both men were probationary employees who were performing poorly. Henry (a black man) was fired while Morgan (a white man) was allowed to apply for a transfer to another section of the company. The Appeal Board found from this disparate treatment, the evidence of Skinner's generally disparaging treatment of black employees, and Skinner's failure to verify whether Henry was not following a command because he had been directed otherwise by Fiddler that Henry was fired because he was black, not because he was performing poorly.

Both Skinner and Henry testified, and the ALJ found, that when Skinner fired Henry, he did so in anger and remarked that Henry could not "cut it," *i.e.*, could not perform. Moreover, the evidence that Skinner generally treated blacks disparagingly but did not treat whites that way, although he was quick tempered and demanding of employees of all races, was not contested and resulted in findings to that effect made by the ALJ and adopted by the Appeal Board. Also, the Appeal Board adopted the ALJ's finding that Henry's performance, as measured by production and efficiency ratings, was deficient. It was the Appeal Board's finding of disparate treatment, contrary to the ALJ's finding, and on a contested issue, that

was crucial to its ultimate finding that despite Skinner's "can't cut it" remark, he in fact fired Henry because Henry is black.

The evidence of disparate treatment in this case was conflicting and only could be resolved by a demeanor-based credibility assessment of certain witnesses. It was the Commission's and Henry's position that Skinner greased the path for Morgan to apply for another job at the company, and thus save himself from being terminated due to poor performance, but stood in the way of Henry's doing so. It was Kaydon's position that nothing of the sort happened.

Employee Ralph Lane, called by the Commission, testified that he understood that Skinner responded to Morgan's performance problems by suggesting that Morgan take the trucker's job. Henry testified that he saw postings for other job positions at Kaydon but did not apply for any of them: "I could not apply for any position, because Mr. Skinner made it clear that the probationary employee cannot transfer or apply for another job." Skinner, called by Kaydon, testified that Henry never asked him about bidding on any other job and never talked to him about the trucker's job that Morgan applied for and was given. Morgan did ask him about the trucker's job, however, and Skinner told him that if he wanted to bid for it, he "wouldn't block him in any way from it."

Depending upon which of these witnesses is believed, and what parts of their testimony are credited, a fact finder reasonably could conclude that Skinner treated Henry and Morgan differently by telling Henry or leading him to think he could not apply for other jobs at Kaydon while leading Morgan to think he could, and then not standing in his way—or reasonably could conclude that Skinner did not do so. Precisely what Skinner said or did, and did not say and do, in this regard is not something that can be determined without a credibility judgment about the witnesses that only can come from observation.

The ALJ did not make a finding about what if anything was said by Skinner to Henry and/or Morgan about the opportunity or lack of opportunity for probationary employees

to transfer to other jobs. Under the "entire record" standard of administrative review, if the ALJ had made such a finding, the Appeal Board would have owed it substantial deference, but could have rejected it for sound reasons. The Appeal Board did neither, because there was no finding, and instead made a finding of its own. In our view, the Appeal Board erred both by failing to recognize that a finding on this issue was material, and therefore should have been made by the ALJ, and by itself making a finding on the issue when it depended on a demeanor-based credibility assessment.

The Appeal Board properly should have remanded the case to the ALJ for him to make findings that resolved the conflict in the evidence over whether Skinner led Henry, a black employee, to think he could not apply for a transfer, while leading Morgan, a white employee, to think he could, and indeed helping him do so. We disagree with Kaydon that the fact that Morgan's father was employed there made the situations in which the two probationary employees found themselves so inherently different that a fact finder could not reasonably infer that Skinner's conduct in treating them differently with respect to the transfer issue, if that conduct indeed occurred, was based on race. While the nepotism practice at Kaydon may have resulted in Morgan's having an advantage over Henry in being awarded the trucker's job, it could not logically explain Henry's being told he could not apply for any job at Kaydon (again, if that is what happened).

The disparate treatment finding made by the Commission was integral to its ultimate finding that Henry was fired due to his race, not due to his poor performance. The disparate treatment finding was not based on substantial evidence, however, because it depended upon resolutions of factual disputes that were not made at all, and should have been made by the ALJ, based on credibility assessments of the witnesses.

We note, contrary to the argument posed by Kaydon, that the ALJ's finding, ultimately adopted by the Appeal Board, that Henry indeed performed poorly as a probationary ma-

chine operator did not dictate a ruling in favor of Kaydon. If there had been substantial evidence of disparate treatment, together with the evidence of generally racially disparaging conduct by Skinner and of Skinner's not taking steps to verify the reason Henry was not operating his third machine, the Commission well could have reasoned that even though Henry was performing poorly, he was not fired for that reason; rather, he was fired because he was black. There was not substantial evidence of disparate treatment, however, because the record on that issue was incomplete.

For these reasons, we shall reverse the judgment of the circuit court. We shall remand the case with instructions to vacate the Commission's decision; and to further remand the case to the Commission with instructions to remand it to the ALJ for further findings on the issue of disparate treatment, in accordance with this opinion.

### Remedy: Economic Loss

Finally, Kaydon challenges the Commission's decision to award Henry back pay based on the difference between the wages he would have earned had he remained in the machine operator's job for 36 months after the date of discharge and the wages in fact earned during that period in other employment. Because of our disposition of the case, it is not necessary to address this issue.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED AND DECISION OF THE COMMISSION ON HUMAN RELATIONS VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO VACATE THE DECISION OF THE COMMISSION ON HUMAN RELATIONS AND REMAND THE CASE TO THAT COMMISSION FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**